(Slip Opinion)    OCTOBER TERM, 2006    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LONG ISLAND CARE AT HOME, LTD., ET AL. *v.* COKE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 06–593.   Argued April 16, 2007—Decided June 11, 2007

The Fair Labor Standards Amendments of 1974 exempted from the minimum wage and maximum hours rules of the Fair Labor Standards Act of 1938 (FLSA) persons "employed in domestic service employment to provide companionship services for individuals . . . unable to care for themselves."  29 U. S. C. §213(a)(15).  Under a Labor Department (DOL) regulation labeled an "Interpretatio[n]" (hereinafter third-party regulation), the exemption includes those "companionship" workers "employed by an . . . agency other than the family or household using their services."  29 CFR §552.109(a).  However, DOL's "General Regulations" also define the statutory term "domestic service employment" as "services of a household nature performed by an employee in or about a private home . . . *of the person by whom he or she is employed*."  §552.3 (emphasis added).  Respondent, a "companionship services" provider to the elderly and infirm, sued petitioners, her former employer Long Island Care and its owner, seeking minimum and overtime wages they allegedly owed her.  The parties assume the FLSA requires the payments only if its "companionship services" exemption does not apply to workers paid by third-party agencies such as Long Island Care.  The District Court dismissed the suit, finding the third-party regulation valid and controlling.  The Second Circuit found the regulation unenforceable and set the judgment aside.

*Held:* The third-party regulation is valid and binding.  Pp. 4–16.

  (a) An agency's power to administer a congressionally created program necessarily requires the making of rules to fill any " 'gap' " left, implicitly or explicitly, by Congress.  *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843.  When an agency fills such a gap reasonably, and in accordance with other applicable

(*e.g.*, procedural) requirements, that result is legally binding. *Id.*, at 843–844. On its face, the third-party regulation seems to fill a statutory gap. Pp. 4–5.

(b) The regulation does not exceed DOL's delegated rulemaking authority. The FLSA explicitly leaves gaps as to the scope and definition of its "domestic service employment" and "companionship services" terms, 29 U. S. C. §213(a)(15), and empowers the DOL to fill these gaps through regulations, 1974 Amendments, §29(b). Whether to include workers paid by third parties is one of the details left to the DOL to work out. Although the pre-1974 FLSA already covered *some* third-party-paid companionship workers, *e.g.*, those employed by large private enterprises, it did not then cover others, *e.g.,* those employed directly by the aged person's family or by many smaller private agencies. Thus, whether, or how, the statutory definition should apply to such workers raises a set of complex questions, *e.g.,* should the FLSA cover *all* of them, *some* of them, or *none* of them? How should the need for a simple, uniform application of the exemption be weighed against the fact that some (but not all) of the workers were previously covered? Given the DOL's expertise, satisfactory answers to the foregoing questions may well turn upon its thorough knowledge of the area and ability to consult at length with affected parties. It is therefore reasonable to infer that Congress intended its broad grant of definitional authority to the DOL to include the authority to answer such questions. Respondent's reliance on the Social Security statute, whose text expressly answers a "third party" coverage question, and on conflicting statements in the 1974 Amendments' legislative history, is unavailing. Pp. 5–8.

(c) Although the literal language of the third-party regulation and the "General Regulation," §552.3, conflicts as to whether third-party-paid workers are included within the statutory exemption, several reasons compel the Court to agree with the DOL's position, set forth in an "Advisory Memorandum" explaining (and defending) the third-party regulation, that that regulation governs here. First, a decision that §552.3 controls would create serious problems as to the coverage of particular domestic service employees by the statutory exemption or by the FLSA as a whole. Second, given that the third-party regulation's *sole purpose* is to explain how the companionship services exemption applies to persons employed by third-party entities, whereas §552.3's primary purpose is to describe the *kind of work* that must be performed to qualify someone as a "domestic service" employee, the third-party regulation is the more specific with respect to the question at issue and therefore governs, see, *e.g.*, *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384–385. Third, that the DOL may have interpreted the two regulations differently at different times in their

history is not a ground for disregarding the present interpretation, which the DOL reached after proposing a different interpretation through notice-and-comment rulemaking, making any unfair surprise unlikely, cf. *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 212. Fourth, while the Advisory Memorandum was issued only to DOL personnel and written in response to this litigation, this Court has accepted such an interpretation where, as here, an agency's course of action indicates that its interpretation of its own regulation reflects its considered views on the matter in question and there is no reason to suspect that its interpretation is merely a *post hoc* rationalization. Pp. 8–11.

(d) Several factors compel the Court to reject respondent's argument that the third-party regulation is an "interpretation" not meant to fill a statutory "gap," but simply to describe the DOL's view of what the FLSA means, and thus is not entitled to *Chevron* deference, cf. *United States* v. *Mead Corp.*, 533 U. S. 218, 232. For one thing, the regulation directly governs the conduct of members of the public, " 'affecting individual rights and obligations.' " *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 302. When promulgating the regulation and when considering amending it, the DOL has always employed full public notice-and-comment procedures, which under the Administrative Procedure Act (APA) need not be used when producing an "interpretive" rule, 5 U. S. C. §553(b)(A). And for the past 30 years, according to the Advisory Memorandum (and not disputed by respondent), the DOL has treated the regulation as a legally binding exercise of its rulemaking authority. For another thing, the DOL may have placed the third-party regulation in Subpart B of Part 552, entitled "Interpretations," rather than in Subpart A, "General Regulations," because Subpart B contains matters of detail, interpreting and applying Subpart A's more general definitions. Indeed, Subpart B's other regulations—involving, *e.g.,* employer "credit[s]" against minimum wages for provision of "food," "lodging," and "drycleaning"—strongly indicate that such details, not a direct interpretation of the statute's language, are at issue. Finally, the Court assumes *Congress* meant and expected courts to treat a regulation as within a delegation of "gap-filling" authority where, as here, the rule sets forth important individual rights and duties, the agency focuses fully and directly upon the issue and uses full notice-and-comment procedures, and the resulting rule falls within the statutory grant of authority and is reasonable. *Mead*, *supra*, at 229–233. Pp. 11–14.

(e) The Court disagrees with respondent's claim that the DOL's 1974 notice-and-comment proceedings were legally "defective" because the DOL's notice and explanation were inadequate. Fair notice is the object of the APA requirement that a notice of proposed rule-

Syllabus

making contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U. S. C. §553(b)(3). The Circuits have generally interpreted this to mean that the final rule must be a logical outgrowth of the rule proposed. Initially, the DOL's proposed regulation would have placed outside the §213(a)(15) exemption (and hence left subject to FLSA wage and hour rules) individuals employed by the large enterprise third-party employers covered before 1974. Since that was simply a proposal, however, its presence meant that the DOL was *considering* the matter and might later choose to keep the proposal or to withdraw it. The DOL finally withdrew it, resulting in a determination exempting *all* third-party-employed companionship workers from the FLSA, and that possibility was reasonably foreseeable. There is also no significant legal problem with the DOL's explanation that its final interpretation is more consistent with FLSA language. No one seems to have objected to this explanation at the time, and it still remains a reasonable, albeit brief, explanation. Pp. 14–16.

462 F. 3d 48, reversed and remanded.

BREYER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–593

LONG ISLAND CARE AT HOME, LTD., ET AL., PETITIONERS *v.* EVELYN COKE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 11, 2007]

JUSTICE BREYER delivered the opinion of the Court.

A provision of the Fair Labor Standards Act exempts from the statute's minimum wage and maximum hours rules

> "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary [of Labor])." 29 U. S. C. §213(a)(15).

A Department of Labor regulation (labeled an "interpretation") says that this statutory exemption includes those "companionship" workers who "are employed by an employer or agency other than the family or household using their services." 29 CFR §552.109(a) (2006). The question before us is whether, in light of the statute's text and history, and a different (apparently conflicting) regulation, the Department's regulation is valid and binding. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984). We conclude that it is.

## I
## A

In 1974, Congress amended the Fair Labor Standards Act of 1938 (FLSA or Act), 52 Stat. 1060, to include many "domestic service" employees not previously subject to its minimum wage and maximum hour requirements.  See Fair Labor Standards Amendments of 1974 (1974 Amendments), §§7(b)(1), (2), 88 Stat. 62 (adding 29 U. S. C. §206(f), which provides for a minimum wage for domestic service employees, and §207(l), which extends overtime restrictions to domestic service employees).  When doing so, Congress simultaneously created an exemption that *excluded* from FLSA coverage certain subsets of employees "employed in domestic service employment," including babysitters "employed on a casual basis" and the companionship workers described above.  §7(b)(3), 88 Stat. 62, (codified at 29 U. S. C. §213(a)(15)).

The Department of Labor (Department or DOL) then promulgated a set of regulations that included two regulations at issue here.  The first, set forth in a subpart of the proposed regulations entitled "General Regulations," defines the statutory term "domestic service employment" as

> "services of a household nature performed by an employee in or about a private home . . . *of the person by whom he or she is employed* . . . such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use [as well as] babysitters employed on other than a casual basis."  40 Fed. Reg. 7405 (1975) (emphasis added) (codified at 29 CFR §552.3).

The second, set forth in a later subsection entitled "Interpretations," says that exempt companionship workers include those

"who are employed by an employer or agency other than the family or household using their services . . . [whether or not] such an employee [is assigned] to more than one household or family in the same work-week . . . ." 40 Fed. Reg. 7407 (codified at 29 CFR §552.109(a)).

This latter regulation (which we shall call the "third-party regulation") has proved controversial in recent years. On at least three separate occasions during the past 15 years, the Department considered changing the regulation and narrowing the exemption in order to bring within the scope of the FLSA's wage and hour coverage companionship workers paid by third parties (other than family members of persons receiving the services, who under the proposals were to remain exempt). 58 Fed. Reg. 69310–69312 (1993); 60 Fed. Reg. 46798 (1995); 66 Fed. Reg. 5481, 5485 (2001). But the Department ultimately decided not to make any change. 67 Fed. Reg. 16668 (2002).

B

In April 2002, Evelyn Coke (respondent), a domestic worker who provides "companionship services" to elderly and infirm men and women, brought this lawsuit against her former employer, Long Island Care at Home, Ltd., and its owner, Maryann Osborne (petitioners). App. 1, 19; 267 F. Supp. 2d 332, 333–334 (EDNY 2003). She alleged that the petitioners failed to pay her the minimum wages and overtime wages to which she was entitled under the FLSA and a New York statute, and she sought a judgment for those unpaid wages. App. 21–22. All parties assume for present purposes that the FLSA entitles Coke to the payments if, but only if, the statutory exemption for "companionship services" does not apply to companionship workers paid by third-party agencies such as Long Island Care. The District Court found the Department's third-party

regulation valid and controlling, and it consequently dismissed Coke's lawsuit. 267 F. Supp. 2d, at 341.

On appeal, the Second Circuit found the Department's third-party regulation "unenforceable" and set aside the District Court's judgment. 376 F. 3d 118, 133, 135 (2004). Long Island Care and Osborne sought certiorari. At the Solicitor General's suggestion, we vacated the Second Circuit's decision and remanded the case so that the Circuit could consider a recent DOL "Advisory Memorandum" explaining (and defending) the regulation. 546 U. S. 1147 (2006); App. E to Pet. for Cert. 50a (Wage and Hour Advisory Memorandum No. 2005–1 (Dec. 1, 2005) (hereinafter Advisory Memorandum)). The memorandum failed to convince the Second Circuit, which again held the regulation unenforceable. 462 F. 3d 48, 50–52 (2006) *(per curiam)*. Long Island Care and Osborne again sought certiorari. And this time, we granted their petition and set the case for argument.

## II

We have previously pointed out that the "'power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Chevron*, 467 U. S., at 843 (quoting *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974); omission in original). When an agency fills such a "gap" reasonably, and in accordance with other applicable (*e.g.*, procedural) requirements, the courts accept the result as legally binding. 467 U. S., at 843–844; *United States* v. *Mead Corp.*, 533 U. S. 218, 227 (2001).

In this case, the FLSA explicitly leaves gaps, for example as to the scope and definition of statutory terms such as "domestic service employment" and "companionship services." 29 U. S. C. §213(a)(15). It provides the Department of Labor with the power to fill these gaps

through rules and regulations. *Ibid.;* 1974 Amendments, §29(b), 88 Stat. 76 (authorizing the Secretary of Labor "to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act"). The subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which, as we said, Congress entrusted the agency to work out.

The Department focused fully upon the matter in question. It gave notice, it proposed regulations, it received public comment, and it issued final regulations in light of that comment. 39 Fed. Reg. 35383 (1974); 40 Fed. Reg. 7404. See *Mead*, *supra*, at 230. The resulting regulation says that employees who provide "companionship services" fall within the terms of the statutory exemption irrespective of who pays them. Since on its face the regulation seems to fill a statutory gap, one might ask what precisely is it about the regulation that might make it unreasonable or otherwise unlawful?

Respondent argues, and the Second Circuit concluded, that a thorough examination of the regulation's content, its method of promulgation, and its context reveals serious legal problems—problems that led the Second Circuit to conclude that the regulation was unenforceable. In particular, respondent claims that the regulation falls outside the scope of Congress' delegation; that it is inconsistent with another, legally governing regulation; that it is an "interpretive" regulation not warranting judicial deference; and that it was improperly promulgated. We shall examine each of these claims in turn.

A

Respondent refers to the statute's language exempting from FLSA coverage those "employed in domestic service employment to provide companionship services for indi-

viduals who (because of age or infirmity) are unable to care for themselves." 29 U. S. C. §213(a)(15). She claims that the words "domestic service employment" limit the provision's scope to those workers employed by persons who themselves receive the services (or are part of that person's household) and exclude those who are employed by "third parties." And she advances several arguments in favor of this position.

Respondent points to the overall purpose of the 1974 Amendments, namely to *extend* FLSA coverage, see, *e.g.*, H. R. Rep. No. 93–232, pp. 2, 8 (1973); she notes that prior to the amendments the FLSA already covered companionship workers employed by certain third parties (*e.g.*, private agencies that were large enough, in terms of annual sales, to qualify for the FLSA's "enterprise coverage" provisions, 29 U. S. C. §§206(a), 207(a)(1) (1970 ed.), see §§203(r), (s)(1) (defining "enterprise" and "enterprise engaged in commerce or the production of goods for commerce")); and she concludes that Congress must therefore have meant its "domestic service employment" language in the exemption to apply only to persons not employed by third parties such as Long Island Care. Respondent tries to bolster this argument by pointing to statements made by some Members of Congress during floor debates over the 1974 Amendments. See, *e.g.*, 119 Cong. Rec. 24801 (1973) (statement of Sen. Burdick) ("I am not concerned about the professional domestic who does this as a daily living," but rather about "people who might have an aged father, an aged mother, an infirm father, an infirm mother, and a neighbor comes in and sits with them"). And she also points to a different statute, the Social Security statute, which defines "domestic service employment" as domestic work performed in "a private home *of the employer*." 26 U. S. C. §3510(c)(1) (2000 ed.) (emphasis added; internal quotation marks omitted).

We do not find these arguments convincing. The statu-

tory language refers broadly to "domestic service employment" and to "companionship services." It expressly instructs the agency to work out the details of those broad definitions. And whether to include workers paid by third parties within the scope of the definitions is one of those details.

Although the FLSA in 1974 already covered *some* of the third-party-paid workers, it did not at that point cover others. It did not cover, for example, companionship workers employed directly by the aged person's family; nor did it cover workers employed by many smaller private agencies. The result is that whether, or how, the definition should apply to workers paid by third parties raises a set of complex questions. Should the FLSA cover *all* companionship workers paid by third parties? Or should the FLSA cover *some* such companionship workers, perhaps those working for some (say, large but not small) private agencies, or those hired by a son or daughter to help an aged or infirm mother living in a distant city? Should it cover *none*? How should one weigh the need for a simple, uniform application of the exemption against the fact that some (but not all) third-party employees were previously covered? Satisfactory answers to such questions may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the Department of Labor, possesses. And it is consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions.

Because respondent refers to the Social Security statute and the legislative history, we add that unlike the text of the Social Security statute, the text of the FLSA does not expressly answer the third-party-employment question. Compare 26 U. S. C. §3510(c)(1) with 29 U. S. C. §213(a)(15). Nor can one find any clear answer in the

statute's legislative history. Compare 119 Cong. Rec. 24801 (statement of Sen. Burdick, quoted above), with, *e.g.*, *id.*, at 24798 (statement of Sen. Johnston) (expressing concern that requiring payment of minimum wage to companionship workers might make such services so expensive that some people would be forced to leave the work force in order to take care of aged or infirm parents).

B

Respondent says that the third-party regulation conflicts with the Department's "General Regulation" that defines the statutory term "domestic service employment." Title 29 CFR §552.3 says that the term covers services "of a household nature performed by . . . employee[s]" ranging from "maids" to "cooks" to "housekeepers" to "caretakers" and others, "in or about a private home . . . *of the person by whom he or she is employed*" (emphasis added). See also §552.101(a). A companionship worker employed by a third party to work at the home of an aged or infirm man or woman is not working at the "home . . . of the person by whom he or she is employed" (*i.e.*, she is not working at the home of the third-party employer). Hence, the two regulations are inconsistent, for the one limits the definition of "domestic service employee" for purposes of the 29 U. S. C. §213(a)(15) exemption to workers employed by the household, but the other includes in the subclass of exempt companionship workers persons who are *not* employed by the household. Respondent adds that, given the conflict, the former "General Regulation" must govern (primarily because, in her view, only the former regulation is entitled to *Chevron* deference, an issue we address in Part II–C, *infra*).

Respondent is correct when she says that the literal language of the two regulations conflicts as to whether workers paid by third parties are included within the statutory exemption. The question remains, however,

which regulation governs in light of this conflict. The Department, in its Advisory Memorandum, suggests that the third-party regulation governs, and we agree, for several reasons.

First, if we were to decide the contrary, *i.e.*, that the text of the General Regulation, 29 CFR §552.3, controls on the issue of third-party employment, our interpretation would create serious problems. Although §552.3 states that it is supplying a definition of "domestic service employment" only "[a]s [that term is] used" in the statutory exemption, 29 U. S. C. §213(a)(15), the rule appears in other ways to have been meant to supply a definition of "domestic service employment" for the FLSA as a whole (a prospect the Department endorses in its Advisory Memorandum). Why else would the Department have included the extensive list of qualifying professions, virtually none of which have anything to do with the subjects of §213(a)(15), babysitting and companionship services? But if we were to apply §552.3's literal definition of "domestic service employment" (including the "home . . . of the [employer]" language) across the FLSA, that would place outside the scope of FLSA's wage and hour rules any butlers, chauffeurs, and so forth who are employed by *any* third party. That result seems clearly contrary to Congress' intent in enacting the 1974 Amendments, particularly if it would withdraw from FLSA coverage all domestic service employees previously covered by the "enterprise coverage" provisions of the Act.

If, on the other hand, §552.3's definition of "domestic service employment" were limited to the statute's exemption provision, applying this definition literally (by removing all third-party employees from the exemption) would extend the Act's coverage not simply to third-party-employed companionship workers paid by large institutions, but also to those paid directly by a family member of an elderly or infirm person receiving such services whenever the family member lived in a different household

than the invalid. Nothing in the statute suggests that Congress intended to make the exemption contingent on whether a family member chose to reside in the same household as the invalid, and it is a result that respondent herself seems to wish to avoid. See Brief for Respondent 34, n. 31.

Second, normally the specific governs the general. *E.g.*, *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384–385 (1992); *Simpson* v. *United States*, 435 U. S. 6, 15 (1978). The *sole purpose* of the third-party regulation, §552.109(a), is to explain how the companionship services exemption applies to persons employed by third-party entities, whereas the primary (if not sole) purpose of the conflicting general definitional regulation, §552.3, is to describe the *kind of work* that must be performed by someone to qualify as a "domestic service" employee. Given that context, §552.109(a) is the more specific regulation with respect to the third-party-employment question.

Third, we concede that the Department may have interpreted these regulations differently at different times in their history. See, *e.g.*, 58 Fed. Reg. 69311 (employees of a third-party employer qualify for the exemption only if they are also jointly employed "by the family or household using their services"); D. Sweeney, DOL Opinion Letter, Home Health Aides/Companionship Exemption, 6A LRR, Wages and Hours Manual 99:8205 (Jan. 6, 1999) (similar). But as long as interpretive changes create no unfair surprise—and the Department's recourse to notice-and-comment rulemaking in an attempt to codify its new interpretation, see 58 Fed. Reg. 69311, makes any such surprise unlikely here—the change in interpretation alone presents no separate ground for disregarding the Department's present interpretation. Cf. *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 212 (1988).

Fourth, we must also concede, as respondent points out, that the Department set forth its most recent interpreta-

tion of these regulations in an "Advisory Memorandum" issued only to internal Department personnel and which the Department appears to have written in response to this litigation. We have "no reason," however, "to suspect that [this] interpretation" is merely a "'*post hoc* rationalizatio[n]'" of past agency action, or that it "does not reflect the agency's fair and considered judgment on the matter in question." *Auer* v. *Robbins*, 519 U. S. 452, 462 (1997) (quoting *Bowen*, *supra*). Where, as here, an agency's course of action indicates that the interpretation of its own regulation reflects its considered views—the Department has clearly struggled with the third-party-employment question since at least 1993—we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief. See 519 U. S., at 462.

For all these reasons, we conclude that the Department's interpretation of the two regulations falls well within the principle that an agency's interpretation of its own regulations is "controlling" unless "'"plainly erroneous or inconsistent with"'" the regulations being interpreted. *Id.*, at 461 (quoting *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 359 (1989), in turn quoting *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945)). See also *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965).

C

Respondent also argues that, even if the third-party regulation is within the scope of the statute's delegation, is perfectly reasonable, and otherwise complies with the law, courts still should not treat the regulation as legally binding. Her reason is a special one. She says that the regulation is an "interpretive" regulation, a kind of regulation that may be used, not to fill a statutory "gap," but simply to describe an agency's view of what a statute means. That kind of regulation may "persuade" a reviewing court,

*Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944), but will not necessarily "bind" a reviewing court. Cf. *Mead*, 533 U. S., at 232 ("interpretive rules . . . enjoy no *Chevron* status *as a class*" (emphasis added)).

Like respondent, the Court of Appeals concluded that the third-party regulation did not fill a statutory gap and hence was not legally binding. 376 F. 3d, at 131–133; 462 F. 3d, at 50–51. It based its conclusion upon three considerations: First, when the Department promulgated a series of regulations to implement the §213(a)(15) exemptions, 29 CFR pt. 552, it placed the third-party regulation in Subpart B, entitled "Interpretations," not in Subpart A, entitled "General Regulations." Second, the Department said that regulations 552.3, .4, .5, and .6, all in Subpart A, contained the "definitions" that the statute "require[s]." Third, the Department initially said in 1974 that Subpart A would "defin[e] and delimi[t] . . .the ter[m] 'domestic service employee,'" while Subpart B would "se[t] forth . . . a statement of general policy and interpretation concerning the application of the [FLSA] to domestic service employees." 376 F. 3d, at 131–132; 462 F. 3d, at 50–51 (quoting 39 Fed. Reg. 35382).

These reasons do not convince us that the Department intended its third-party regulation to carry no special legal weight. For one thing, other considerations strongly suggest the contrary, namely that the Department intended the third-party regulation as a binding application of its rulemaking authority. The regulation directly governs the conduct of members of the public, "'affecting individual rights and obligations.'" *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 302 (1979) (quoting *Morton,* 415 U. S., at 232). When promulgating the rule, the agency used full public notice-and-comment procedures, which under the Administrative Procedure Act an agency need not use when producing an "interpretive" rule. 5 U. S. C. §553(b)(A) (exempting "interpretative rules, general

statements of policy, or rules of agency organization, procedure, or practice" from notice-and-comment procedures). Each time the Department has considered amending the rule, it has similarly used full notice-and-comment rulemaking procedures. 58 Fed. Reg. 69310 (1993); 60 Fed. Reg. 46797 (1995); 66 Fed. Reg. 5485 (2001). And for the past 30 years, according to the Department's Advisory Memorandum (and not disputed by respondent), the Department has treated the third-party regulation like the others, *i.e.*, as a legally binding exercise of its rulemaking authority. App. E to Pet. for Cert. 63a–64a.

For another thing, the Subpart B heading "Interpretations" (and the other indicia upon which the Court of Appeals relied) could well refer to the fact that Subpart B contains matters of detail, interpreting and applying the more general definitions of Subpart A. Indeed, Subpart B's other regulations—involving such matters as employer "credit[s]" against minimum wage payments for provision of "food," "lodging," and "drycleaning," 29 CFR §552.100(b), and so forth—strongly indicate that such details, not a direct interpretation of the statute's language, are at issue.

Finally, the ultimate question is whether *Congress* would have intended, and expected, courts to treat an agency's rule, regulation, application of a statute, or other agency action as within, or outside, its delegation to the agency of "gap-filling" authority. Where an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, where the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable, then a court ordinarily assumes that Congress intended it to defer to the agency's determination. See *Mead, supra*, at 229–233.

The three contrary considerations to which the Court of Appeals points are insufficient, in our view, to overcome

the other factors we have mentioned, all of which suggest that courts should defer to the Department's rule. And that, in our view, is what the law requires.

D

Respondent's final claim is that the 1974 agency notice-and-comment procedure, leading to the promulgation of the third-party regulation, was legally "defective" because notice was inadequate and the Department's explanation also inadequate. We do not agree.

The Administrative Procedure Act requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U. S. C. §553(b)(3). The Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be "a 'logical outgrowth' of the rule proposed." *National Black Media Coalition* v. *FCC*, 791 F. 2d 1016, 1022 (CA2 1986). See also, *e.g.*, *United Steelworkers of America, AFL–CIO–CLC* v. *Marshall*, 647 F. 2d 1189, 1221 (CADC 1980), cert. denied *sub nom. Lead Industries Assn., Inc.* v. *Donovan*, 453 U. S. 913 (1981); *South Terminal Corp.* v. *EPA*, 504 F. 2d 646, 659 (CA1 1974). The object, in short, is one of fair notice.

Initially the Department proposed a rule of the kind that respondent seeks, namely a rule that would have placed outside the exemption (and hence left subject to FLSA wage and hour rules) individuals employed by third-party employers whom the Act had covered prior to 1974. 39 Fed. Reg. 35385 (companionship workers "not exempt" if employed by a third party that already was a "covered enterprise" under the FLSA). The clear implication of the proposed rule was that companionship workers employed by third-party enterprises that *were not* covered by the FLSA prior to the 1974 Amendments (*e.g.*, most

smaller private agencies) *would* be included within the §213(a)(15) exemption.

Since the proposed rule was simply a proposal, its presence meant that the Department was *considering* the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it. As it turned out, the Department did withdraw the proposal for special treatment of employees of "covered enterprises." The result was a determination that exempted *all* third-party-employed companionship workers from the Act. We do not understand why such a possibility was not reasonably foreseeable. See, *e.g.*, *Arizona Public Serv. Co.* v. *EPA*, 211 F. 3d 1280, 1299–1300 (CADC 2000) (notice sufficient where agency first proposed that Indian tribes be required to meet the "same requirements" as States with respect to judicial review of Clean Air Act permitting actions, but then adopted a final rule that exempted tribes from certain, though not all, requirements), cert. denied *sub nom. Michigan* v. *EPA,* 532 U. S. 970 (2001).

Neither can we find any significant legal problem with the Department's explanation for the change. The agency said that it had "concluded that these exemptions can be available to such third party employers" because that interpretation is "more consistent" with statutory language that refers to "'any employee' engaged 'in' the enumerated services" and with "prior practices concerning other similarly worded exemptions." 40 Fed. Reg. 7405. There is no indication that anyone objected to this explanation at the time. And more than 30 years later it remains a reasonable, albeit brief, explanation. See *Global Crossing Telecommunications, Inc.* v. *Metrophones Telecommunications, Inc.*, 550 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 18).

Respondent's only contrary argument apparently consists of her claim that the explanation does not take proper account of the statute's reference to "domestic service employees," which term (given the Social Security

statute and legislative history) must refer only to those who are paid by the household for whom they provide services. If so, she simply repeats in different form arguments that we have already considered and rejected. See Part II–A, *supra.*

### III

For these reasons the Court of Appeals' judgment is reversed, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*