SHEPHERD, Circuit Judge.
Following an industrial accident, the Secretary of Labor (Secretary)[1] determined that the Loren Cook Company (Loren Cook) violated 29 C.F.R. § 1910.212(a)(1), which requires barrier guards on certain industrial equipment. The Secretary imposed a $490,000 fine against Loren Cook. An Administrative Law Júdge (ALJ) rejected the Secretary’s interpretation of section 1910.212(a)(1) and vacated the fine. The Occupational Safety and Health Review Commission (Commission) adopted the ALJ’s decision as its own. The Secretary petitioned this court for review of the Commission’s order. A divided panel of this court granted the petition for review and reversed the Commission’s order. In granting Loren Cook’s petition for rehearing en banc, we vacated the panel decision. We now deny the Secretary’s petition for review and affirm the Commission’s order.
I.
Loren Cook is an industrial manufacturer of air circulating equipment. Loren Cook uses lathes, which are industrial turning machines used to form and mold metal discs, in its manufacturing process. Lathes operate by holding heavily lubricated pieces of metal that rotate rapidly, allowing the lathe operator to apply tools to shape the metal into individual workpieces. Lathes vary in size depending on the size of the workpiece being produced. In May 2009, a Loren Cook lathe operator was killed when a 12-pound rotating metal workpiece broke free from the lathe, flew out of his machine, and struck him in the head. The lathe ejected the workpiece at a speed of 50 to 70 miles per hour and, after the workpiece struck the operator in the head, it traveled along the floor at least another 20 feet before crashing into metal shelving.
In November 2009, the Secretary - conducted an investigation of the industrial accident and issued two citations against Loren Cook. Relevant to this appeal, one citation found seven violations of 29 C.F.R. § 1910.212(a)(1) for failure to employ barrier guards to protect workers from ejected workpieces. Section 1910.212(a)(1) provides:
Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point, of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are — barrier guards, two-hand tripping devices, electronic safety devices, etc.
The Secretary determined that Loren Cook’s failure to employ barrier guards to prevent the ejection of a'workpiece from this kind of catastrophic breakdown of a lathe violated section 1910.212(a)(1). The Secretary assessed Loren Cook a fine of $70,000 for each violation of this section, resulting in a total fine of $490,000.
*938 Loren Cook sought review from an ALJ, who, after conducting a 20-day hearing and compiling an extensive record, concluded that section 1910.212(a)(1) did not apply to the conduct for which the Secretary cited Loren Cook. The ALJ reasoned that section 1910.212(a)(1) focuses on point-of-contaet risks and risks associated with the routine operation of lathes, such as flakes and sparks, but does not contemplate the catastrophic failure of a lathe that would result in .a workpiece being thrown out of the lathe. The ALJ thus vacated the citation the Secretary issued against Loren Cook. The Commission adopted the unmodified recommendation of the ALJ. The Secretary subsequently petitioned our court for review of the Commission’s final order pursuant to 29 U.S.C. § 660(b).
II.
We' review a petition seeking review of a Commission order under a deferential standard pursuant to the Administrative Procedures Act, upholding the Commission’s factual findings if they are “supported by substantial evidence on the record considered as a whole,” and upholding the Commission’s legal conclusions ‘.‘unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Solis v. Summit Contractors, Inc., 558 F.3d 815, 823 (8th Cir.2009) (internal quotation marks omitted). The Commission adopted the ALJ’s order finding section 1910.212(a)(1) does not address catastrophic failures of lathes resulting in the ejection of workpieces and instead only considers routine risks of operation. The Secretary argues this was in error because the Secretary’s interpretation of its own regulation is entitled to considerable deference and the ALJ failed to afford the Secretary’s interpretation such deference.
Applying Seminole Rock[2] deference, we generally afford substantial deference to the Secretary’s interpretation of his own regulations. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). But deference to the Secretary’s interpretation is only appropriate when both the interpretation itself and the manner in which the Secretary announces the interpretation are reasonable. See Martin, 499 U.S. at 157-58, 111 S.Ct. 1171.
*939 The Supreme Court has identified several circumstances under which a court should not afford deference to an agency’s interpretation of its own regulation. First, deference to an agency’s interpretation is inappropriate when the interpretation is “ ‘plainly erroneous or inconsistent with the regulation.’ ” Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359,109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Second, deference is also inappropriate “when there is reason to suspect that the agency’s interpretation ‘does not reflect the agency’s fair and considered judgment on the matter in question.’ ” Christopher v. SmithKline Beecham Corp., — U.S. -, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (quoting Auer, 519 U.S. at 462, 117 S.Ct. 905). This may be evidenced by an agency’s current position conflicting with prior interpretations, by an agency’s use of the position as nothing more than a litigating position, or by the use of the interpretation as a post hoc rationalization for a prior action. Id. at 2166.
Finally, deference ds inappropriate when an agency’s new interpretation of its own regulation results in unfair surprise. Id. at 2167. In declining to afford deference to the Department of Labor’s interpretation of one of its regulations, the Christopher Court noted that giving the interpretation deference would “impose potentially massive liability on [the regulated entity] for conduct that occurred well before that interpretation was announced.” Id. When the relevant agency fails to provide the regulated entity with a fair warning of what conduct a regulation prohibits, allowing the agency’s interpretation to prevail would result in unfair surprise. Id. The risk of unfair surprise is particularly relevant when the “agency’s announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction.” Id. at 2168. As the Court noted:
It is one thing to expect regulated parties to conform their conduct to an agency’s interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency’s interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.
Id. Such a “decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary’s elaboration of pertinent policy considerations, and on other factors relevant to the reasonableness of the Secretary’s exercise of delegated lawmaking powers.” Martin, 499 U.S. at 158, 111 S.Ct. 1171 (citations omitted).
Our court has also acknowledged the parameters under which we should afford an agency’s interpretation deference: “[DJeference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency’s interpretation is the result of thorough and reasoned consideration.” Solis, 558 F.3d at 823 (quoting Advanta USA, Inc. v. Chao, 350 F.3d 726, 728 (8th Cir.2003)); see also Advanta, 350 F.3d at 728 (“The DOL’s interpretation is not conclusive, and we are not necessarily bound by the DOL’s interpretation of the [regulation].”); Sioux Valley Hosp. v. Bowen, 792 F.2d 715, 720 (8th Cir.1986) (“The erratic history of the labor/delivery room policy is not the kind of interpretation justifying deference to the Secretary’s expertise.”).
This precedent provides the framework under which we must assess the Secretary’s interpretation of section 1910.212(a)(1), evaluating the current interpretation: (1) for fidelity to the text of *940 the regulation itself; (2) for its consistency with prior interpretations; and (3) for the possibility of unfair surprise. Under this framework, we conclude that the Secretary’s interpretation of section 1910.212(a)(1) is unreasonable and thus is not entitled to deference.
A.
First, the Secretary’s interpretation of section 1910.212(a)(1) strains a commonsense reading of the section. The basic operative language of the section identifies five examples of hazards the barrier guards are meant to protect a lathe operator from: “hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.” 29 C.F.R. § 1910.212(a)(1). We note that the inclusion of the words “such as” in the language of the regulation indicates this list is illustrative rather than exhaustive. See Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (8th Cir.1981). These five hazards create two distinct categories: sources or causes of the hazard (point of operation, ingoing nip points, and rotating parts) and by-products from routine operation of the machinery (flying chips and sparks).
It follows that section 1910.212(a)(1) only covers the catastrophic failure of a lathe and the ejection of a workpiece if such an event is like one of these two categories. This event is not like the first category because a plain reading of the regulation limits this category to sources of the hazard relating to the worker’s point of contact with the machinery and does not encompass the ejection of a spinning workpiece. Section 1910.212(a) (3) (i) defines “point of operation” as “the area on a machine where work is actually performed upon the material being processed.” And this section provides that the requisite barrier guard “shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.” 29 C.F.R. § 1910.212(a)(3)(ii). This definition of “point of operation” is further supported by section 1910.212(a)(3)(iv), which lists several machines — including shears, power presses, milling machines, and forming rolls— which all require the operators to make contact with the machine’s operating cycle. In the context of the lathes employed by Loren Cook, the point of operation is where the lathe operator touches the tool to the spinning workpiece to shape the workpiece.
Further, the use of “rotating parts” in the language of section 1910.212(a)(1) does not encompass the event at issue here because the section contemplates hazards from rotating parts related to the operator’s contact with the machine rather than the anomalous ejection of objects from the machine. In reaching this conclusion, we evaluate the meaning of the term “rotating parts” by considering the other enumerated examples around it. See United States v. Williams, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (“In context, however, those meanings are narrowed by the commonsense canon of noscitur a soci-is — which counsels that a word is given more precise content by the neighboring words with which it is associated.”). The hazards that a lathe’s- rotating parts create — much like the hazards from point of operation and nip points — result from contact with the lathe, including the danger of an operator’s clothing, limbs, or hair becoming caught in or struck by the rotating parts. This limited interpretation of rotating parts is consistent with OSHA’s machine guarding interpretative guidance. See Occupational Safety and Health Administration, Machine Guarding eTools, https://www.osha.gov/SLTC/etools/machine guarding/motions_actions.html (last visited Sept. 30, 2015) (“Rotating motion can be dangerous; even smooth, slowly rotating *941 shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position.”).
The Secretary’s hyper-literal interpretation of a hazard created by “rotating parts” defies logic and seems to permit section 1910.212(a)(1) to' apply to virtually any situation, no matter how remote or atypical, in which a hazard can be tied to some movement on a machine. Cf. White Indus., Inc. v. Fed. Aviation Admin., 692 F.2d 532, 535 (8th Cir.1982) (rejecting the FAA’s interpretation of a regulation as “unduly technical”). The guarding devices section 1910.212(a)(1) enumerates — barrier guards, two-hand tripping devices, and electronic safety devices — aim to prevent ingress by the operator into the danger zone while the lathe is running. This supports Loren Cook’s limited interpretation of this section. These guarding devices would do little to prevent the hazard for which the Secretary cited Loren Cook: the high-speed ejection of a workpiece nearly 3 feet in diameter and weighing 12 pounds.
This event also is not like the second category of hazards because a 12-pound ejected workpiece differs greatly both in nature and quality from a by-product hazard created by routine operation of a lathe. The enumerated by-product hazards in the regulation — flying chips and sparks — are incidental to the normal operation of a lathe, and differ markedly from the hazard created by the ejection of a 12-pound workpiece from a spinning lathe. Because these hazards differ so significantly, we cannot conclude that a 12-pound ejected workpiece is the same kind of hazard so as to be included by the regulation’s use of the phrase “such as.” See Donovan, 666 F.2d at 327 (explaining that the use o'f “such as” in regulation indicates illustrative rather than exhaustive list). We thus conclude the Secretary’s interpretation does not comport with the language of the regulation itself.
B.
Second, the Secretary has failed to provide any evidence showing that he has consistently interpreted section 1910.212(a)(1) to apply to the ejection of large objects from a lathe. Although alone not dispositive, the Secretary himself concedes that he has never issued a citation like the one he issued to Loren Cook. We recognize the Secretary’s need for flexibility to adapt regulatory language to a variety of situations and that a variety of factors influence his discretionary decision to issue a citation. See Christopher, 132 S.Ct. at 2168. And, in affording the Secretary this flexibility, we also recognize that the Secretary could piece together a series of interpretations that demonstrate a trend toward the current interpretation. But the Secretary has failed to produce a single citation, publication, or interpretation that could fairly be characterized as similar to the position the Secretary announced in the citation against Loren Cook.
The Secretary argues that the standard interpretation letters[3] that he cites indicate that section 1910.212(a)(1) is to be broadly construed to guard “against all” hazards and his current interpretation is simply a “natural extension” of such an interpretation. But these interpretation letters only vaguely indicate that section 1910.212(a)(1) should be construed broadly to cover a variety of hazards and only serve to underscore that the Secretary has consistently failed to take his current position. Allowing such an interpretation to prevail could create the risk that the Sec *942 retary may never provide more specific interpretative guidance so as to avoid limiting his future ability to construe his own ambiguous regulations. See Christopher, 132 S.Ct. at 2168 (“[The] practice [of deferring to an agency’s interpretation of its own ambiguous regulations] also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit.”).
The Secretary’s own current machine guarding guidance provides the following description of the hazards created by rotating parts:
Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position. Injuries due to contact with rotating parts can be severe. Collars, couplings, cams, clutches, flywheels, shaft ends, spindles, meshing gears, and horizontal or vertical shafting are some examples of common rotating mechanisms which may be hazardous. The danger increases when projections such as set screws, bolts, nicks, abrasions, and projecting keys or set screws are exposed on rotating parts.
Occupational Safety and Health Administration, Machine Guarding eTools, supra; see also Loren Cook’s App. at 1333-85, 1427. This interpretation, focused on the potential of a machine’s intact rotating part grabbing or snagging hair or clothing and striking, crushing, or pining body parts, differs considerably from the interpretation espoused in the Secretary’s citation to Loren Cook, which asserts that rotating parts could cause the ejection of a large workpiece from a lathe.
Further, the Secretary’s unarticulated intent to interpret section 1910.212(a)(1) to cover the hazard of an ejected workpiece runs counter to the prevailing opinion about the scope of this section. See, e.g., Long Mfg. Co., N.C., Inc. v. Occupational Safety & Health Review Comm’n, 554 F.2d 903, 908 (8th Cir.1977) (“When [section 1910.212(a)(1) ] is read as a whole, it simply requires that when a machine is a source of danger to operatives at the point of operation, that point must be guarded by some appropriate means or device for the purpose of preventing any part of the body of the operator from being in the danger zone during the machine’s operating cycle.... ”); Caterpillar, Inc., 1994 CCH OSHD ¶ 42318, at *1 (No. 93-373, 1994) (ALJ) (“Section 1910.212(a) ... generally protects the operator from dangers associated with the point of operation. While the type of machine covered by the standard varies widely, the basic targeted hazard does not. A machine’s function and the manner in which it is operated create the hazard anticipated by the standard.” (citation omitted)), aff'd, 17 BNA OSHC 1731 (No. 93-373,1996).
The Second Circuit, in Carlyle Compressor Co. v. Occupational Safety & Health Review Commission, 683 F.2d 673 (2d Cir.1982), rejected the Secretary’s attempt to interpret section 1910.212(a)(1) to include large objects thrown from a spinning machine. Id. at 674-75. Although the Second Circuit acknowledged its obligation to “give deference to an agency’s reasonable interpretation of its own standards,” it reasoned that section 1910.212(a)(1) could not be reasonably “stretched” to “cover[ ] anything flying out of machines.” Id. at 675. The Secretary did nothing to react to the Second Circuit’s unequivocal rejection of this.interpretation. Moreover, the Secretary knew how Loren Cook conducted its production process after having issued a 2004 citation to Loren Cook for violating section 1910.212 by failing to guard its semi-automatic spinning lathes, which operate similarly to the lathes at issue here. See Loren Cook Co., 21 BNA OSHC 1705 (No. 04-2179, 2006) (ALJ). The ALJ noted that “[t]he only hazard established by *943 the Secretary [in the 2004 violation] is the point of operation hazard created by the spinning blank,” and continued that “[t]he Secretary failed to show any other part of the spinning machines presented a hazard requiring guarding.” Id. at *3. The focus of the Secretary’s 2004 inspection was on points of operation — consistent with its machine guarding guidance, Carlyle, and established practice — not on ejected workpieces. Based on this evidence, we cannot conclude the Secretary’s current interpretation is consistent with his prior interpretations.
C.
Finally, the Secretary’s announcement of such an unprecedented interpretation in the citation against Loren Cook amounted to unfair surprise. There are “strong reasons” for withholding deference from an agency’s interpretation of an ambiguous regulation when an agency acquiesces in an interpretation for an extended period of time and then changes its interpretation to sanction conduct that occurred prior to the new interpretation. See Christopher, 132 S.Ct. at 2167-69; see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170-71, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) (“[A]s long as interpretive changes create no unfair surprise ... the change in interpretation alone presents no separate ground for disregarding the Department’s present interpretation.”). When “an agency’s announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute.” Christopher, 132 S.Ct. at 2168.
After the Second Circuit issued its opinion in Carlyle, the Secretary failed to issue a single citation proclaiming his current interpretation, amend the language of the section to clarify the section’s scope, or issue interpretative guidance indicating his current position. Cf. Solis, 558 F.3d at 826-27 (reasoning that the Secretary’s position was consistent because the Secretary continued to take a broad view of the applicable regulation despite contrary administrative decisions). The Secretary instead appeared to agree with the Carlyle Court that the regulation, did not require machine guarding to protect operators against the risk of the unexpected ejection of large workpieces.. The Secretary’s “conspicuous inaction” here is only amplified by his history with Loren Cook, providing evidence that the Secretary was familiar with the manner in which Loren Cook conducted its operations, particularly with respect to the operation of its lathes. We thus conclude that the Secretary’s announcement of his current interpretation in the citation he issued to Loren Cook amounted to unfair surprise.
III.
In sum, although we recognize both the Secretary’s expertise in workplace safety matters and his need for flexibility in construing ambiguous regulations, viewing the interpretation of section 1910.212(a)(1) through the lens of Seminole Rock deference requires us to conclude that this interpretation is not entitled to substantial deference. Having determined the Secretary’s interpretation of section 1910.212(a)(1) is not entitled to deference, we conclude that this section does not cover the conduct for which the Secretary cited Loren Cook. For the foregoing reasons, we deny the petition for review and affirm the Commission’s order. We also deny Loren Cook’s pending motions to strike.

. The Secretary acts through the Occupational Safety and Health Administration (OSHA) to create and enforce workplace health and safety standards. Solis v. Summit Contractors, Inc., 558 F.3d 815, 818 (8th Cir.2009). We refer to OSHA and the Secretary jointly as the “Secretary.”

. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (providing framework for deference to agency regulatory interpretations). We recognize the concerns raised about Seminole Rock’s consistency with separation-of-power principles, see Decker v. Nw. Envtl. Def. Ctr., - U.S. -, 133 S.Ct. 1326, 1342, 185 L.Ed.2d 447 (2013) (Scalia, J., concurring in part and dissenting in part) ("[HJowever great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.”); see generally Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Co-lum. L.Rev. 612 (1996), and the perverse incentive it provides agencies to issue ambiguous regulations, see Christopher, 132 S.Ct. at 2168 ('TTlhis practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby ‘frustratfing] the notice and predictability purposes of rulemaking.’ ” (second alteration in original) (quoting Talk Am., Inc. v. Mich. Bell Tele. Co., 564 U.S. 50, 131 S.Ct. 2254, 2266, 180 L.Ed.2d 96 (2011) (Scalia, J., concurring))); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 525, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (Thomas, J., dissenting). Some Justices have indicated that the Court is willing to take a serious look at the continued validity of the doctrine. Decker, 133 S.Ct. at 1338-39 (Roberts, C.J., concurring).

. OSHA Std. Interp. 1910.212 (D.O.L.), 2008 WL 4455006 (May 16, 2008); OSHA Std. Interp. 1910.212 (D.O.L.), 2005 WL 3801510 (Feb. 8, 2005); OSHA Std. Interp. 1910 Sub-part O (D.O.L.), 1990 WL 10090096 (Mar. 21, 1990).