IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| BAYLEY CONSTRUCTION A GENERAL PARTNERSHIP, | ) ) ) | No. 77600-2-I |
| Appellant, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | ) ) ) | |
| Respondent. | ) | FILED: October 21, 2019 |

SCHINDLER, J. — A structural steelworker fell 42 feet to his death through a 5/8-inch-thick plywood floor-hole cover. The Washington State Department of Labor and Industries (Department) cited the general contractor Bayley Construction General Partnership (Bayley) for a serious violation of the Washington Industrial Safety and Health Act of 1973, chapter 49.17 RCW, and the floor hole cover regulation, WAC 296-155-24615(3)(a)(ii).[1] The serious violation citation states Bayley violated WAC 296-155-24615(3)(a)(ii) by failing to ensure the 5/8-inch-thick plywood cover was capable of supporting the "maximum potential load" of the worker. The Board of Industrial Insurance Appeals (Board) affirmed the decision to issue the serious violation citation.

---

[1] We note that in 2016, the Department amended chapter 296-155 WAC to replace the word "shall" with "must" and to use roman numerals. Wash. St. Reg. 16-09-085 (May 20, 2016). We quote the language of the WAC provisions in effect in 2014 throughout the opinion.

Bayley appeals the superior court order affirming the Board. We conclude substantial evidence supports finding the existence of a work site hazard, that Bayley knew or should have known the work site created a substantial probability of serious physical harm or death, and the Board did not err in concluding Bayley violated WAC 296-155-24615(3)(a)(ii). We also conclude Bayley was not denied fair notice of the Department's interpretation of WAC 296-155-24615(3)(a)(ii). We affirm the superior court order affirming the Board decision.

Construction of Health and Sciences Building

Bayley Construction was the general contractor on the project to construct a new three-story health and sciences building at Bellevue College. The heating, ventilation, and air conditioning (HVAC) system for the building was designed for installation on the roof of the building.

Bayley workers constructed a 32-inch-tall "stem wall" on the roof of the building to enclose a 32-inch-wide by 62-inch-long rectangular hole for HVAC equipment. Bayley general foreman Christopher Babbitt used 5/8-inch-thick plywood to construct a 48-inch-wide by 60-inch-long floor hole cover and spray-painted the word "HOLE" on the cover.

Bayley hired Evergreen Erectors as the structural steel subcontractor to construct a 16-foot-high "wind wall" to surround the HVAC system. Evergreen Erectors structural steelworker journeymen Theodore (T.J.) Merry and Allen Wahl and third year apprentice Bryan Johnson worked on construction of the wind wall.

<u>July 21, 2014 Accident</u>

On July 21, 2014, the Evergreen structural steelworkers were welding angle iron onto the wind wall. The workers used clamps to secure the angle iron. Wahl was working on the outside of the wind wall. Merry was using a large stepladder to work on the inside of the wind wall. The ladder was positioned in the southeast corner of the wind wall next to the stem wall and the floor hole cover. Bayley construction workers had attached 2-inch by 4-inch "whalers" on the outside of the stem wall in preparation for pouring concrete in the stem wall that day.



Merry weighed 257 pounds and was wearing a 20-pound tool belt. While Merry was standing on the ladder approximately five feet above the surface of the roof, Wahl told Merry that he needed another clamp. Wahl watched Merry climb down the ladder, step onto the top of the stem wall, and jump onto the plywood floor-hole cover.

Johnson was working on the outside of the wind wall when he heard someone "yell[ ] my name." Johnson "turned around" and saw Merry standing on top of the stem wall, then jump and land with both feet on the plywood floor-hole cover. The plywood broke under his weight. Wahl saw Merry "tr[y] to grab the edge" before he fell 42 feet to his death.

Serious Violation of WAC 296-155-24615(3)(a)(ii)

Department safety compliance officers Javier Sarmiento and Christopher Troxell conducted an investigation of the accident. Sarmiento and Troxell interviewed Babbitt and a number of workers, including Wahl and Johnson. Sarmiento and Troxell took photographs and measurements of the work site, including the wind wall, the stepladder, the stem wall, and the hole opening.

The Department issued a citation and notice of assessment against Bayley for a serious violation of WAC 296-155-24615(3)(a)(ii). The citation states, in pertinent part:

> As the exposing employer (Bayley Construction employees) and creating and controlling contractor (Evergreen Erector's employees), the employer did not ensure that all floor openings had floor covers that were capable of supporting the maximum potential load with a safety factor of four as required by WAC 296-155-24615(3)(a)(ii).

Appeal to the Board

Bayley appealed the citation and notice of assessment for a serious violation of WAC 296-155-24615(3)(a)(ii) to the Board of Industrial Insurance Appeals (Board). Bayley alleged the Department could not establish a serious violation of WAC 296-155-24615(3)(a)(ii). Bayley argued it complied with the fall restraint requirement for a floor hole cover by using 5/8-inch-thick plywood that was capable of supporting the maximum

4

"intended" load. Bayley asserted the decision of Merry to jump on the plywood cover was not foreseeable.

The Board of Industrial Insurance Appeals judge (IAJ) held a hearing. The Department presented the testimony of Bayley foreman Babbitt, Evergreen steelworkers Wahl and Johnson, safety compliance officers Sarmiento and Troxell, and Department Division of Occupational Safety and Health (DOSH) standards and technical services expert David Conley.

Babbitt testified the first step is to "[f]ind the right material to cover [the] hole and understand what the intended load will be on that hole." Babbitt said the "intended load" "varies depending on the size of the opening" and "the location." Babbitt testified that to determine the intended load, he "typically" used the weight of the heaviest worker, or approximately 250 pounds, multiplied by four. Babbitt said the floor hole cover has to be "able to withstand four times the intended load." But Babbitt testified, "[I]t's basically up to the journeyman carpenter to determine whether that is sufficient or not because it could vary depending on the size of the hole." Babbitt decided to use medium density 5/8-inch-thick plywood to construct the floor hole cover for the 32-inch by 62-inch hole in the roof near the stem wall. Babbitt testified that " '[i]n the future we need to strengthen our hole covers. Although it was not intended to be jumped on, it is clearly a possibility.' "

Department safety compliance officer Sarmiento testified that when he inspected the work site after the accident, Bayley's on-site superintendent told him that after the accident, Bayley replaced the 5/8-inch floor hole covers with thicker 3/4-inch floor hole

5

covers. Sarmiento testified that he was taught to use at least 3/4-inch-thick plywood for a floor cover and never used 5/8-inch-thick plywood.[2]

Department safety compliance officer Troxell testified that using the weight of a worker plus a tool belt multiplied by four is not sufficient to comply with the requirement under WAC 296-155-24615(3)(a)(ii) to install a floor hole cover capable of supporting the "maximum potential load." Troxell said calculating the weight of the heaviest worker plus a tool belt times four is a "starting point." Troxell testified the contractor needs to take into account work site conditions and dynamic forces created by a worker tripping or falling onto the floor hole cover.

Troxell testified Wahl and Johnson admitted that while working on the wind wall, the Evergreen steelworkers frequently were "[g]oing in and out" of the stem wall enclosure.

The Department designated DOSH standards and technical expert Conley to testify about construction safety rules and WAC 296-155-24615(3)(a)(ii). Conley said WAC 296-155-24615(3)(a)(ii) had been in effect since 1986 and before this accident, the Department had not previously interpreted the WAC or the meaning of "maximum potential load."

Conley testified WAC 296-155-24615(3)(a)(ii) is a "performance standard," not a "specification standard." WAC 296-155-24615(3)(a)(ii) does not specify "what material has to be used. Only that it meets certain strength requirements."

> A performance standard gives general requirements for an employer to
> follow, and a . . . specification standard is more specific to, say, a certain
> requirement for, say, tensile strength of a vertical lifeline must be 5,000

---

[2] DOSH expert Conley also testified that he was taught to use "no less than 3/4 inch plywood."

pounds, where we actually give specific information about what we want the requirement to be.

Conley testified the phrase "maximum potential load" as used in WAC 296-155-24615(3)(a)(ii) means "what is possible or what is the greatest load that could be imposed on that cover." Conley said that in determining the "maximum potential load" for a floor hole cover, the employer must consider the potential that a worker will slip, trip, or fall on the cover because a "dynamic load" creates more force than a "static load." Conley testified that in calculating the "maximum potential load," the employer must therefore "tak[e] into account the greatest amount of force that could be placed on that cover" at the work site. "[I]f you multiply that by a factor of four, it should really be strong enough to withstand just about anything."

Engineering and safety expert Kurt Stranne, third-party safety director Steven Heist, and Bayley safety director Joseph Chandler testified on behalf of Bayley.

Stranne testified that when teaching compliance with the WAC 296-155-24615(3)(a)(ii) floor hole cover standard, he uses the phrase "maximum intended load" instead of "maximum potential load" because the phrase "intended load" is used to describe the fall restraint specifications for a personal fall restraint system with anchorage points. See WAC 296-155-24615(1)(e) (a "personal fall restraint system" "shall be rigged to allow the movement of employees only as far as the unprotected sides and edges of the walking/working surface, and shall consist of . . . . [a]nchorage points used for" a personal fall restraint system "capable of supporting four times the intended load").

Stranne testified that dynamic load should be taken into consideration only for fall arrest regulations[3] and not fall restraint regulations. Stranne described a static load as a worker standing on a floor hole cover. However, Stranne conceded that walking as well as tripping or falling onto a floor hole cover is a dynamic load.[4]

Stranne reviewed a September 10, 2014 report that Pacific Engineering Technologies structural engineer Mark Schaefer prepared for the Department. The report addressed the strength of 5/8-inch-thick plywood. Schaefer concluded a 5/8-inch-thick "MDO[5] style of plywood" could support 1,246 pounds.

Stranne testified that he used "two different ways" to calculate the strength of the plywood with the weight of a worker at "310 pounds" and "the weight at 257 plus a 25-pound tool belt." Stranne testified that "a 310-pound man falling[,] . . . assuming he's falling instead of jumping[,] from the stem wall to the cover" would create a force "greater than the value of the plywood." Stranne concluded the floor hole cover would not have been able to sustain a fall from the 32-inch stem wall.

> Using deceleration distance, I came out with 1,690 pounds. And using the time as the deceleration distance or the deceleration factor, I came out with 1,265 pounds, both of them greater than the value of the plywood.

Third-party safety administrator Heist testified that when training safety compliance officers about the WAC "cover specification requirements," he uses the

---

[3] See WAC 296-155-24613.

[4] Stranne testified:

Q. And if an employee were to trip and fall onto a floor covering, that fall would be imposing a dynamic load, correct?
A. Yes. That's where the factor of safety of 4 would begin.
Q. And if an employee fell off a 32-inch stem wall onto a floor covering, that would impose a dynamic load, right?
A. Yes.

[5] Medium density overlay.

phrase "maximum intended load" because the word "intended" is used in the subsection of WAC 296-155-24615(3)(a) that governs a manhole cover in a roadway. See WAC 296-155-24615(3)(a)(i) (manhole covers must be "designed to carry a truck rear axle load of at least two times the maximum intended load"). Heist testified that he calculates the "maximum intended load" for workers at a work site by using the weight of the heaviest worker with a tool belt times four.

Heist testified the phrase "maximum potential load" does not apply to "a worker falling from a ladder." However, Heist admitted a floor hole cover should be "sufficient for it to be able to take the static or potentially any other loads that might be on it working in that area."

> Q    So you're — so if I'm understanding what you're saying, you're saying that the rule would cover a dynamic load if someone trips and falls. But if, say, they're 35 inches above — 36 inches, whatever, on a ladder and fall onto a floor covering, that the rule does not cover that? Is that what you're saying?
>
> A    If I were to be working from an elevation, the same level, then the hole cover should be able to sustain the forces that are being put on it. And a qualified person is the one that would make that determination as to, would it be sufficient for it to be able to take the static or potentially any other loads that might be on it working in that area.

Bayley safety director Chandler testified that he had no knowledge that the subcontractors were "going inside [the] stem wall." Chandler said that on July 21, 2014, workers were scheduled to pour concrete into the stem wall. Chandler testified the Evergreen workers attended the safety meeting that morning. At the meeting, Chandler instructed that all the workers stay out of the stem wall area "because we have a pour that day."

In the posthearing brief, Bayley argued the Department did not establish Bayley had actual or constructive knowledge of the hazard because it was not foreseeable that a worker would jump off the stem wall onto the floor hole cover. Bayley asserted the Department erred in interpreting the meaning of the phrase "maximum potential load" as used in WAC 296-155-24615(3)(a)(ii). Bayley argued the term "potential" is synonymous with the term "intended" and the maximum "intended load" is calculated by taking the weight of the heaviest worker plus tools and multiplying by four. Bayley also argued it did not have fair notice of the Department's interpretation of WAC 296-155-24615(3)(a)(ii).

The IAJ issued a proposed decision and order affirming the citation against Bayley for a serious violation of WAC 296-155-24615(3)(a)(ii). The IAJ concluded WAC 296-155-24615(3)(a)(ii) applied, Bayley violated the regulation, and Bayley had constructive knowledge of the hazardous condition. The proposed decision and order stated, "Because Mr. Merry and others clearly were working in areas near the floor opening, Bayley should have considered the potential load created by a worker stumbling, falling, or jumping onto the cover."

The IAJ rejected the argument that Bayley did not have fair notice of the Department's interpretation of WAC 296-155-24615(3)(a)(ii).

> Bayley asserts that the Department's interpretation of the regulation should be rejected because Bayley did not have fair notice of the interpretation. But there is no evidence that the Department previously interpreted the regulation in a way that was inconsistent with an interpretation upon which Bayley relied.

Bayley filed a petition for review of the proposed decision and order to the Board. Bayley argued the Department did not prove a prima facie case that Bayley committed a

serious violation of WAC 296-155-24615(3)(a)(ii), expert testimony established the plywood floor-hole cover was strong enough for the "intended use," and it was "unforeseeable that the employee would have access to the floor hole and its cover." Bayley argued substantial evidence did not support finding Bayley had constructive knowledge of the violation.

The Board issued a 14-page "Decision and Order" and entered findings of fact and conclusions of law. The Board affirmed the citation and notice against Bayley for a serious violation of WAC 296-155-24615(3)(a)(ii) but modified the amount of the penalty.[6]

Bayley appealed the Decision and Order to superior court. The superior court affirmed.

Appeal of Board Decision and Order

Bayley seeks reversal of the Board Decision and Order. Bayley contends the Department did not meet its burden of proving Bayley committed a serious violation of WAC 296-155-24615(3)(a)(ii). Bayley argues the Board erred in interpreting the meaning of "maximum potential load" and the 5/8-inch-thick plywood floor-hole cover met the requirements of WAC 296-155-24615(3)(a)(ii). Bayley also claims the Department's interpretation of WAC 296-155-24615(3)(a)(ii) violated its right to fair notice and due process and challenges evidentiary rulings.

WISHA and Standard of Review of Board Decision

The Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, governs our review of a Board decision. RCW 49.17.150(1).

---

[6] One member of the Board dissented, arguing "maximum potential load" applies only to a static load and the Department's interpretation is an "unreachable" strict liability standard.

The Washington State Constitution mandates protection of workers at a construction work site. Art. II, § 35. Article II, section 35 provides, "The legislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same."

The legislature enacted WISHA in 1973. LAWS OF 1973, ch. 80. The purpose of WISHA is "to assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010.

> [T]he legislature in the exercise of its police power, and in keeping with the mandates of Article II, section 35 of the state Constitution, declares its purpose by the provisions of this chapter to create, maintain, continue, and enhance the industrial safety and health program of the state, which program shall equal or exceed the standards prescribed by the Occupational Safety and Health Act of 1970 (Public Law 91-596, 84 Stat. 1590).

RCW 49.17.010. We must construe WISHA statutes and regulations liberally to achieve the purpose of providing safe working conditions for workers in Washington. Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 36, 329 P.3d 91 (2014); see also RCW 49.17.050, .120, .180.

The legislature delegates broad authority to the Department to adopt regulations to meet the general safety principles set forth in WISHA. RCW 49.17.040. WISHA requires an employer to "furnish to each of his or her employees a place of employment free from recognized hazards." RCW 49.17.060(1). WISHA imposes a specific duty to "comply with the rules, regulations, and orders promulgated" by the Department. RCW

49.17.060(2); J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 48, 156 P.3d 250 (2007).

In an appeal of the superior court order affirming the decision of the Board, we review the Board's decision directly, based on the record before the Board. J.E. Dunn Nw., 139 Wn. App. at 42; Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016) (citing Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009)). In a WISHA appeal, the Board's findings of fact are conclusive if supported by substantial evidence. RCW 49.17.150(1); Mowat, 148 Wn. App. at 925. Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. Potelco, 194 Wn. App. at 434 (citing Mowat, 148 Wn. App. at 925). We view the evidence and reasonable inferences in the light most favorable to the prevailing party—here, the Department. Coluccio Constr., 181 Wn. App. at 35. Unchallenged findings are verities on appeal. Coluccio Constr., 181 Wn. App. at 35. If substantial evidence supports the Board's findings, we review whether the findings support the Board's conclusions of law. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 202, 248 P.3d 1085 (2011).

Serious Violation of WAC 296-155-24615(3)(a)(ii)

The Department bears the initial burden of proving a WISHA violation. WAC 263-12-115(2)(b); SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 433, 144 P.3d 1160 (2006). To establish a serious violation of a WISHA safety regulation, the Department must prove (1) the cited standard applies, (2) the requirements of the standard were not met, (3) employees were exposed to or had access to the violative condition, (4) the employer knew or through the exercise of reasonable diligence could

have known of the violative condition, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition. Coluccio Constr., 181 Wn. App. at 36-37; Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2004).

To establish knowledge of a serious WISHA violation, the Department must show " 'the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition.' " Potelco, Inc. v. Dep't of Labor & Indus., 191 Wn. App. 9, 34, 361 P.3d 767 (2015) (quoting Coluccio Constr., 181 Wn. App. at 37). "Reasonable diligence" includes the obligation of an employer to inspect the work site, anticipate hazards that employees may be exposed to, and take measures to prevent the occurrence of a violative condition. Erection Co., 160 Wn. App. at 206-07. The employer has constructive knowledge of a hazardous condition if it is readily observable or in a conspicuous work site location. BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 109-10, 161 P.3d 387 (2007).

Bayley contends insufficient evidence supports the Board finding it committed a serious violation of WAC 296-155-24615(3)(a)(ii). The findings of fact describe the work site hazard on July 21, 2014 when Merry fell to his death through the plywood cover over the hole in the roof:

> 3.      On July 21, 2014, Bayley Construction was the general contractor for a project erecting a building at Bellevue College, with Evergreen Erectors being the structural steel subcontractor. The Evergreen Erectors crew at this project included Theodore (T.J.) Merry. The structural steel crew were on the roof of the building constructing a metal cage or wind wall that was at least 16 feet tall. The crew was welding angle iron, using clamps to help support the work. The crew had access to the interior of the cage by using a stepladder that straddled the cage. Construction of the cage required workers to be inside it periodically.

. . . .

5.    Inside the cage on the roof near the stepladder was a 32-inch high "stem" wall consisting of wood forms and 2x4s that had been set up in preparation of a concrete pour.  One corner of the stem wall was located adjacent to the stepladder used by workers to enter and leave the cage.  Inside the stem wall was a rectangular hole through the roof that was 62 inches long and 32 inches wide, in which HVAC equipment and duct work were to be installed.  A fall through this hole would be approximately 42 feet onto concrete. The hole in the roof was covered by a sheet of 5/8-inch thick plywood that was 60 inches long and 48 inches wide.  The plywood was placed on top of the hole so that on each long end a 1-inch gap was present through which electrical cords and other items could be positioned.  The plywood sheet was affixed to wood surrounding the hole by two large nails driven into the wood within a few inches of each other.  The word "HOLE" in large letters was spray painted onto the top of the plywood sheet using red spray paint.

6.    On July 21, 2014, T.J. Merry was working on the ladder inside the wind wall.  He needed a clamp so he stepped from the ladder onto the stem wall and from there jumped onto the plywood sheet acting as the hole cover, which broke on impact.  Mr. Merry fell through the hole and died.

. . . .

11.    A substantial probability existed that a worker who was exposed to the hazard of falling through the hole in the roof, notwithstanding the placement of the plywood cover above it, would incur a serious bodily injury, including the possibility of fractures, paralysis, or death.

12.    The severity of the hazard in Item No. 1-1 of Citation and Notice No. 317401172 is rated as a 6 on a scale of 1 to 6 because the most serious injury that reasonably could be expected to occur was death.

The Board also rejected the argument that it was unforeseeable that a worker

would "step or jump over" the stem wall onto the plywood floor-hole cover to "pick up

parts or angle iron, or for other job-related" tasks:

> [W]hen access to the inside of the cage is by a stepladder placed in close proximity to the stem wall and the corridor between the cage and the stem wall is narrow and pinched to less than a foot at one point by a 2x4 [whaler] extending into that space, it is reasonably foreseeable that workers would step or jump over the 32-inch tall stem wall when traveling across the inside of the cage to weld in a different location, pick up parts or angle iron, or for other job-related duties.

Substantial evidence supports the Board finding workers were exposed to falling 42 feet through the plywood floor-hole cover and a substantial probability that serious physical harm or death could result, and Bayley knew or should have known of the work site hazard.

Department safety compliance officer Sarmiento investigated the accident and took measurements and photographs of the work site. Bayley safety director Chandler testified the photographs accurately depict the work site.

The photographs showed the path at the bottom of the ladder between the wind wall and the stem wall was very "narrow" and measured only 10 ½ inches wide.

> Q     How many inches did [Merry] have to walk through?
> A     Ten-and-a-half, I took a measurement.
> Q     So if hypothetically Mr. Merry had gotten all the way off the ladder and had walked around the stem wall, would he have to have walked past where your tape measurement was?
> A     Yes. He [would] have to walk through this area.
> Q     And it's how many inches?
> A     Ten-and-a-half.
> . . . .
> A     That was obvious to me that this person they have an area free to walk around it. The person, he was completely barricaded by this piece of lumber which is called a whaler. A whaler helps to reinforce the concrete forms. The concrete forms, they were ready to pour that day, so that was obvious to me that that form was complete.

16

Sarmiento said it was "[h]ard for me to work in-between the whaler and the wind — wind screen wall being so — it reduced the space. . . . [I]f that was hard for me to walk by, a person with tools, yes, it's going to be harder yet."



Troxell also testified that the space to get around the stem wall was narrow and difficult to walk through. Troxell testified that if Merry did not "go over the stem wall," he would have had to "turn sideways and shuffle through" the narrow path because "the other direction" was physically impossible to walk through:

Q.    And would it have been possible for him to go the other direction around the stem wall?
A.    . . . . Right there at the base of the ladder, the distance there looks to be roughly — I was looking at all these photos again yesterday, and it looks like it's about maybe just slightly more than the thickness of two two-by-fours because there was a couple of two-by-fours jammed in there, and so I can't imagine it more than about four inches in width.
Q.    If he had gone the other direction not —
A.    Yes. If he gone along the tube framework of the wind wall for the wind wall itself.
Q.    It would be how many inches?

A. About four. I'm guessing three to four inches.
Q. So it wouldn't be physically possible [to do that?]
A. No.

Troxell testified that Wahl and Johnson told him that they frequently "straddl[ed]" over the stem wall form" to enter and exit the stem wall area while working on the wind wall. The Board found the testimony of Johnson and Wahl credible:

> [T]he very act of erecting the cage and the stem wall inside of it required that some workers be working immediately adjacent to the hole. It is clear from the photographic exhibits that on July 21, 2014, the crew could not have completed welding the cage without being inside it on occasion. Thus, the admissions of both Mr. Wahl and Mr. Johnson to the Department's safety officers that they had repeatedly worked inside the stem wall are believable.

Bayley contends it did not know that work on the wind wall exposed the workers to the hazard of falling through the floor hole cover. Bayley also points to the testimony that safety director Chandler specifically instructed the Evergreen Erectors workers to stay out of the stem wall area on July 21, 2014. The Board rejected the argument that Bayley did not know about the work site hazard—"Bayley Construction knew or should have known that workers would have access to the hole in the roof inside the cage or wind wall and that a fall through that hole would result in serious bodily harm or death."

> Bayley insists that the iron workers had no work-related reason to be inside the stem wall. Mr. Wahl and Mr. Johnson testified that they were instructed not to venture inside the stem wall. Their testimony that they followed this instruction was contradicted by statements they gave to the Department's safety inspectors, to whom they admitted having worked inside the stem wall and also straddling it while working.

The uncontroverted testimony of DOSH construction industry standards expert Conley also established "falls from ladders" are "very common" and "one of the top two" sources of injuries at construction sites.

18

Substantial evidence supports finding a work site hazard and that Bayley knew or should have known the Evergreen Erectors workers were exposed to the hazard of falling through the plywood floor-hole cover. Evergreen workers were obviously working on the construction of the wind wall and using a stepladder positioned next to the stem wall and the large floor-hole cover.

<u>Interpretation of WAC 296-155-24615(3)(a)(ii)</u>

Bayley contends the Board erred in interpreting "maximum potential load" in concluding Bayley violated WAC 296-155-24615(3)(a)(ii). The findings of fact state, in pertinent part:

7.    On July 21, 2014, when he jumped onto the hole cover, Mr. Merry weighed 257 pounds and wore a tool belt weighing approximately 20 pounds.

8.    The 5/8th-inch thick piece of plywood used by Bayley as the hole cover could support a load of 1,246 pounds. It could support the static weight of Mr. Merry and his tool belt, even when multiplying it by 4 as the required safety factor.

9.    The dynamic load or force placed on the plywood-hole cover by Mr. Merry and his tool belt at the moment of impact after the jump on top of it exceeded 1,246 pounds. This resulted in the breaking of the plywood-hole cover and Mr. Merry's fall onto concrete 42 feet below.

10.    The plywood-floor-opening cover was not sufficient to support the maximum potential load, which included the force of an employee jumping or falling from an elevation above the floor opening, with a safety factor of four.

The Board rejected Bayley's argument that "maximum <u>potential</u> load" means "maximum <u>intended</u> load." The conclusions of law state, in pertinent part:

2.    The phrase "maximum potential loads" in WAC 296-155-24615(3)(a) encompasses all potential loads, not just intended loads.

3. The phrase "maximum potential loads" in WAC 296-155-4615(3)(a) includes dynamic loads or force as well as static loads or force.

We review the Board's interpretation of regulations de novo. Erection Co., 160 Wn. App. at 201. Our objective is to ascertain and give effect to the intent of the regulation. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

Our interpretation begins with the plain meaning of the regulation. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). We look first to the text of the regulation to determine its meaning. Griffin v. Thurston County Bd. of Health, 165 Wn.2d 50, 55, 196 P.3d 141 (2008). "If an administrative rule or regulation is clear on its face, its meaning is to be derived from the plain language of the provision." Cannon v. Dep't of Licensing, 147 Wn.2d 41, 55, 50 P.3d 627 (2002).

We also employ traditional rules of grammar in discerning the plain language of a regulation. In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009). We construe all of the language to give effect to the regulation. Lake, 169 Wn.2d at 526. A construction that would render a portion of the regulation meaningless or superfluous should be avoided. Ford Motor Co. v. City of Seattle, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). "[W]e avoid interpretations 'that yield unlikely, absurd or strained consequences.' " Broughton Lumber Co. v. BNSF Ry., 174 Wn.2d 619, 635, 278 P.3d 173 (2012) (quoting Kilian v. Atkinson, 147 Wn.2d 16, 21, 50 P.3d 638 (2002)). Where the language of a regulation is clear, intent is derived from the language of the regulation alone. City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009). If the plain language is subject to only one interpretation, our inquiry is at an end. Lake, 169 Wn.2d at 526.

WAC 296-155-24603 defines a "fall restraint system" as "[a] system in which all necessary components function together to restrain/prevent an employee from falling to a lower level." WAC 296-155-24609(1) requires employers to provide and implement an "appropriate fall protection system" when employees are working at "four feet or more" off the ground. WAC 296-155-24609(4)(a)(ii) states, "Floor openings shall be guarded by one of the following fall restraint systems. . . . A cover, as specified in WAC 296-155-24615(3)." WAC 296-155-24615(3) states, "Fall restraint protection shall conform to the following provisions":

> Cover specifications.
> (a) Floor opening or floor hole covers shall be of any material that meets the following strength requirements:
> (i) Conduits, trenches, and manhole covers and their supports, when located in roadways, and vehicular aisles shall be designed to carry a truck rear axle load of at least two times the maximum intended load;
> (ii) All floor opening and floor hole covers shall be capable of supporting the maximum potential load but never less than two hundred pounds (with a safety factor of four).
> (A) All covers shall be secured when installed so as to prevent accidental displacement by the wind, equipment, or employees.
> (B) All covers shall be color coded or they shall be marked with the word "hole" or "cover" to provide warning of the hazard.[7]

The WAC does not define the phrase "maximum potential load." Bayley asserts "maximum potential load" means "maximum intended load." Bayley also argues the "maximum potential load" regulation contemplates the calculation of only a static load. We disagree.

We give undefined terms their ordinary meaning as defined in the dictionary. Habitat Watch v. Skagit County, 155 Wn.2d 397, 423, 120 P.3d 56 (2005). The dictionary definition of "maximum" is "the greatest quantity or value attainable in a given case." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1396 (2002).

---

[7] Emphasis added.

Contrary to Bayley's assertion, the word "potential" does not have the same meaning as "intended." "Potential" means "existing in possibility : having the capacity or a strong possibility for development into a state of actuality." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 1775. By contrast, "intended" is defined as "intentional," "to design for . . . a specified purpose," and "to have in mind as a design or purpose : plan." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 1175.

The dictionary definition of "load" does not support the argument that the regulation contemplates only a static load. "Load" means "a mass or weight supported by something" and "the forces to which a structure is subjected because of weights carried on the supports." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 1325.

Where an administrative agency uses two different terms in the same regulation, we presume the agency intends the terms to have different meanings. City of Kent v. Beigh, 145 Wn.2d 33, 45, 32 P.3d 258 (2001). Here, the Department deliberately used the term "potential" instead of the word "intended" when enacting WAC 296-155-24615(3)(a)(ii). WAC 296-155-24615(3)(a)(i) governs the requirements for conduits, trenches, and manhole covers. WAC 296-155-24615(3)(a)(i) states, "Conduits, trenches, and manhole covers and their supports, when located in roadways, and vehicular aisles shall be designed to carry a truck rear axle load of at least two times the maximum intended load."[8] But by contrast, WAC 296-155-24615(3)(a)(ii) states, "All floor opening and floor hole covers shall be capable of supporting the maximum potential load but never less than two hundred pounds (with a safety factor of four)."

The undisputed record establishes WAC 296-155-24615(3)(a)(ii) is a performance standard, not a specification standard. The language "maximum potential

---

[8] Emphasis added.

load" means the employer must take into account dynamic forces and the potential or possible hazard of falling onto the floor hole cover at the work site. The language that a floor hole cover shall not only be capable of "supporting the maximum potential load," but "never less than two hundred pounds (with a safety factor of four)," is the minimum weight the cover shall support. WAC 296-155-24615(3)(a)(ii). We conclude the phrase "maximum potential load" includes possible dynamic loads and not only an intended or static load.

Bayley contends all the witnesses at the hearing agreed that WAC 296-155-24615(3)(a)(ii) only requires the employer to multiply the weight of the heaviest worker times a safety factor of four. Neither the intent of WISHA, the plain language of WAC 296-155-24615(3)(a)(ii), nor the record support this argument. The plain language of the regulation identifies a minimum strength requirement. As Troxell testified, that calculation is only a starting point and does not take into account the work site conditions. DOSH expert Conley testified that "in calculating the maximum potential load, you would be taking into account the greatest amount of force that could be placed on that cover" at the work site. When Bayley's attorney specifically asked Conley if he agreed that the proper compliance method is to only take the heaviest worker and multiply by four, Conley said, "I do not." Bayley's expert Heist testified that a qualified person would need to determine if the floor hole cover is "sufficient for it to be able to take the static or potentially any other loads that might be on it working in that area."

We also reject Bayley's argument that "fall restraint" regulations govern only a static load and "fall arrest" regulations govern only a dynamic load. WAC 296-155-24603 defines a "fall arrest system" as "a fall protection system that will arrest a fall from

elevation. Fall arrest systems include personal fall arrest systems that are worn by the user, catch platforms, and safety nets." "Fall arrest" means "[s]topped after the fall with a 6 [foot] maximum free fall distance." WAC 296-155-24605.

The definition of "fall restraint system" is not limited to a static load. Under WAC 296-155-24605, "fall restraint" means "[r]estrained from falling." See also WAC 296-155-24603. The purpose of a floor opening cover is to restrain or prevent an employee from falling to a lower level. WAC 296-155-24603.

We conclude the Board did not err in concluding WAC 296-155-24615(3)(a)(ii) "encompasses all potential loads, not just intended loads," and "includes dynamic loads."[9] Further, even if ambiguous, we accord substantial weight to an agency's interpretation within its area of expertise and uphold that interpretation if it reflects a plausible construction of the regulation and is not contrary to legislative intent. Roller v. Dep't of Labor & Indus., 128 Wn. App. 922, 926-27, 117 P.3d 385 (2005).

Fair Notice and Due Process

Bayley argues the Department's interpretation of WAC 296-155-24615(3)(a)(ii) and "maximum potential load" violated Bayley's right to "fair notice" and due process. The record does not support the premise of Bayley's argument that the Department "changed" its interpretation of WAC 296-155-24615(3)(a)(ii).[10]

---

[9] The Associated General Contractors of Washington (AGC) filed an amicus curiae brief. AGC contends this interpretation imposes an impossible burden on an employer. But where, as here, "a specific standard exists, the standard is presumed feasible and the burden is on the employer to prove that it is not." SuperValu, 158 Wn.2d at 434 (emphasis in original). Below, Bayley did not assert unfeasibility as an affirmative defense.

[10] AGC also argues the Board erred by using a "new and different" interpretation of "maximum potential load." AGC also cites a sentence in the Board Decision and Order that states, "Bayley insists that the phrase actually means 'maximum intended load,' an interpretation that all of the experts acknowledge had been used by the Department in the past." (Emphasis in original.) But as noted, the uncontroverted record establishes the Department had not previously interpreted "maximum potential load."

24

Conley and Bayley's expert Heist, a former technical specialist for DOSH, testified they were unaware of any previous investigation where an improper floor covering resulted in injury or death. Conley testified:

A    I — we have what we call the wind system, which is the WISHA information network that houses all of our data on consultations and compliance activity. So I searched through those related to this code, and — to look to see if I could come up with any other inspections that referenced this type of incident or. . .
Q    What did you find?
A    I did not find anything related to that.[11]

Heist said that while he was working for the Department, "I know that there were times where workers had fallen through a piece of material, but not — it wasn't a floor hole covering — floor hole opening."

The uncontroverted testimony of Conley established the Department had not previously interpreted the phrase "maximum potential load" in WAC 296-155-24615(3)(a)(ii).

Q    Before this case, has the Department ever had any reason to express its interpretation of the phrase "maximum potential load" in this floor covering rule?
A    Not to my knowledge.
Q    And before this case, is the Department aware of anyone ever raising any questions as to the meaning of the phrase, "maximum potential load," in the floor covering rule?
A    Not to my knowledge.
Q    And are you aware of any previous inspections where the Department had to determine the meaning of the phrase "maximum potential load"?
A    I am not aware of any.
Q    Have you determined when the phrase "maximum potential load" was first included in the floor covering rule?
A    That question was posed to our standards group, and the response that we got from the folks in our standards department said that that language came into effect in January of 1986.

---

[11] Ellipsis in original.

The case Bayley cites, Perez v. Loren Cook Co., 803 F.3d 935 (8th Cir. 2015), is distinguishable. In Perez, the Eight Circuit concluded the United States Secretary of Labor changed a regulation from an old interpretation to a new one. Perez, 803 F.3d at 943.

Excluded Evidence

Bayley contends the Board erred in not considering testimony that "maximum potential load" is the same as "maximum intended load."

We review evidentiary rulings for abuse of discretion. State v. Myers, 133 Wn.2d 26, 34, 941 P.2d 1102 (1997). "The trial court's decision 'will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" Wilson v. Horsley, 137 Wn.2d 500, 505, 974 P.2d 316 (1999) (quoting State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

The Board ruled:

[W]e affirm the denial of additional witness testimony requested by the employer and the publication of deposition excerpts as Exhibit No. 58 pursuant to ER 402 & [ER] 403. As for the employer's complaint about not being allowed to present the testimony of a person designated as a CR 30(b)(6) witness designated to speak on behalf of the Department, we note that David Conley was designated by the Department to testify on its behalf and did so.

The record reflects the testimony of additional witnesses about the interpretation of WAC 296-155-24615(3)(a)(ii) was cumulative. The record also shows that the Department did not designate Scott Reiquam as the CR 30(b)(6) Department witness on the interpretation of WAC 296-155-24615(3)(a)(ii). The Board did not abuse its

discretion in affirming the decision of the hearing examiner denying the request to consider the testimony of additional witnesses and Reiquam.

We conclude the Department established that Bayley committed a serious violation of WAC 296-155-24615(3)(a)(ii).  We affirm the superior court order affirming the Board.

WE CONCUR: